The LANGDON CHEEVES. See Case No. 8,064.

---

## Case No. 8,064.

The LANGDON CHEEVES and The CALE-DONIAN.

Ex parte CAHOONE et al.

[2 Mason, 85.] [1]

Circuit Court, D. Rhode Island. June Term, 1820.

PRIZE—AWARD TO INFORMERS—COMPENSATION FOR EXPENSES.

In an admiralty seizure cause, the court cannot award a proportion of the proceeds of the property condemned, to informers, unless the case be within some statute provision. But it will allow compensation for expenses incurred in securing and preserving the property.

[Cited in Hooper v. Fifty-One Casks of Brandy, Case No. 6,674.]

[The brig Langdon Cheves sailed from the United States on a voyage to Lisbon, with a cargo of provisions in May, 1813, and was captured by a British vessel, and sent into Bermuda. After a detention of about six weeks, she was permitted to proceed on her voyage. On the return voyage from Lisbon with a cargo of salt, she was, on her arrival at Newport, R. I., seized by the collector of that port as forfeited to the United States jure belli for using a British license and trading with the enemy. The facts in the case of the Caledonian were almost identical with the case of the Langdon Cheves. Both vessels, as noted below, were condemned by the circuit court, and, upon appeal, by the supreme court. 4 Wheat. (17 U. S.) 103. After the decision, on appeal, application was made by the owner to have the seamen's wages paid by him allowed him, as also custody fees. Both claims were rejected. Case No. 8,063.] The decree of the circuit court condemning these vessels to the United States, for using British licences, and trading with the enemy, having been affirmed by the supreme court at the February term, 1819, as is fully stated in 4 Wheat. [17 U. S.] 100, 103; and the cases being remitted for further proceedings, to the circuit court, an application on petition was made at a former term of this court, by John Cahoone, commander of the revenue cutter of the United States, belonging to Newport, for an allowance to be made to him out of the proceeds of the condemned property of the Caledonian, as informer, for having given the information to the collector upon which the seizure took place. A like application was made by John Slocum, surveyor of the district of Newport, for a like allowance out of the proceeds of the condemned property of the Langdon Cheeves.

The cases were shortly spoken to at former terms, by counsel for the petitioners, the district attorney making no objection to any allowance which the court might deem itself authorized to award upon these petitions.

STORY, Circuit Justice. This cause has lain over until the present term, with a view to allow the petitioners every chance of obtaining a compensation for their meritorious services, if there could be found any principle of law upon which it could be justified. Upon the fullest inquiry, I am unable to discern any legal ground upon which it can be granted. It will be observed, that the present claim is not for any expenses incurred, or labor performed, by the petitioners, in seizing, preserving, or securing the property which has been condemned to the United States. In such cases, the court would know how to deal with the claim, for as incidental to its general jurisdiction over seizures, it would, on the admiralty side, entertain petitions for compensation. But here the whole claim rests merely on the ground that the petitioners were the first informers, through whose instrumentality the forfeiture to the United States has been successfully asserted. In certain cases, as we all know, the laws, with a view to encourage information of breaches of the revenue system, have given a certain proportion of the penalties and forfeitures annexed to such breaches, to informers. Where such provision has been made, the path is plain; and the court will sedulously guard the rights of those, who thus become entitled to the bounty. There is no pretence, that any such provision exists in the present case; and if the court are to grant compensation here, it must grant it in every other case, where the government derives information material to enforce a forfeiture. Strictly speaking, it is the duty of every citizen to give all his aid, as well by communicating information as otherwise, to the government, to enable it to suppress violations of the laws, and to punish the offenders, and to enforce forfeitures in rem. This is more especially the duty of revenue officers, like the petitioners, who are placed as a watch to guard the public against frauds committed in the course of navigation and commerce; and this duty has been peremptorily pressed upon them in many cases by the express injunctions of statutes. See, among other statutable provisions, the collection act of March 2, 1799, c.

---

[1] [Reported by William P. Mason, Esq.]

128, § 70 [1 Story's Laws, 633; 1 Stat. 678, c. 22]. Now I am not aware that any courts are at liberty to grant rewards in cases where the party has performed a public duty, unless there be some positive regulation, which provides for such cases. It is not sufficient that the service be meritorious and acceptable, nor even that it goes beyond the limits of mere official duty; much less that it is in strict conformity with such duty. To found a title for compensation, there must be either some direct, extraordinary assistance or service, or expense, which the law recognizes as a just charge in rem, independent of any notion of official duty, or some positive statutable enactment in point. Otherwise the party must be left, as Sir William Scott has declared on another occasion, to the general reward of all good citizens and good officers, the fair estimation of his countrymen, and the consciousness of his own right conduct (The Aquila, 1 C. Rob. Adm. 37, 46); or to bring the doctrine home to the present case, to the specific reward in fees and compensation which the law has provided for officers of the revenue, for the performance of their ordinary duties. There are certainly cases in which the law awards compensation to persons for services rendered to the public, as well as to private persons, independent of contract or statute regulation. Such are cases of maritime salvage, granted upon recaptures of public vessels, upon noncommissioned captures, and upon saving derelicts, where the derelicts fall to the sovereign in virtue of his general prerogative. The Aquila, 1 C. Rob. Adm. 37. But the doctrines respecting maritime salvage are not safe guides for other classes of cases, and may be thought to stand upon peculiar grounds of maritime policy, rather than the general analogies of the law. It is, perhaps, not quite certain at the present moment, whether an action would lie for salvage of goods on land; and the case of Nicholson v. Chapman, 2 H. Bl. 254, shows that the subject is not without its difficulties. But was it ever heard of, that an action would lie against a man for giving him beneficial information? Lord Chief Justice Eyre in the case before alluded to, said, "Perhaps it is better for the public, that these voluntary acts of benevolence from one man to another, (i. e. saving his property) which are charities and moral duties, should depend altogether for their reward upon the moral duty of gratitude." If this be true in so strong a case, what shall we say, where the act is a mere performance of a public or official duty? The title to compensation seems removed by the very notion that it is a duty to which the law has annexed no reward.

Without doubt the officers before the court have performed very meritorious services; and are entitled to the consideration of the government. But sitting in a court of justice, and bound to declare the law as I find it, I am constrained to say, that there is no au-

thority here to administer relief to them as informers. The application should be made to another department of the government.

Petitions dismissed.